**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARLIN SANTANA THOMAS,<br><br>Defendant. | No. CR25-58-LTS-MAR<br><br>**ORDER ON REPORT AND RECOMMENDATION** |

## *I. INTRODUCTION*

This case is before me on a Report and Recommendation (R&R) (Doc. 106) in which United States Magistrate Judge Mark A. Roberts recommends that I deny defendant Marlin Santana Thomas' motion (Doc. 42) to dismiss the indictment. Thomas has filed timely objections (Doc. 109), the Government has filed a response (Doc. 110) and Thomas has filed a reply (Doc. 111).

## *II. BACKGROUND*[1]

In 2018, federal authorities, in conjunction with the Des Moines Police Department (DMPD), began investigating Thomas for dealing heroin. Thomas was also facing state charges for human trafficking of a minor. Evidence was gathered that connected Thomas to sex trafficking and prostituting others. By March 2018, an Assistant United States Attorney for the Southern District of Iowa proposed in an internal prosecution memorandum to indict Thomas on heroin offenses to "get him off the street"

---

[1] Thomas objects to the omission of certain information in the factual section of the R&R. Doc. 109 at 1–2. In conducting my de novo review of the record, I have considered the facts cited in Thomas' objections. However, to the extent Thomas asserts that it was erroneous for the R&R to exclude an express reference to those facts, that objection is overruled.

while developing a sex trafficking case against him. Soon after, a grand jury in the Southern District returned a five-count indictment for heroin-related offenses.

Thomas pleaded guilty to the drug charges. On May 21, 2018, the district court accepted the plea. The plea agreement included a non-prosecution clause, promising that "[t]he Government agrees that Defendant will not be charged in the Southern District of Iowa with any other federal criminal offense arising from or directly relating to this investigation." Doc. 88-1 at 1. Another provision stated: "This Plea Agreement is limited to the United States Attorney's Office for the Southern District of Iowa, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities." *Id.* at 6. Thomas was sentenced to 48 months' imprisonment for the heroin offenses.

DMPD and federal authorities continued investigating Thomas' alleged sex-trafficking and uncovered additional victims, further finding that Thomas had taken some victims out-of-state as a part of his illicit business. In 2020, the grand jury for the Southern District of Iowa indicted Thomas on 17 counts of sex trafficking, facilitating prostitution and drug offenses. Thomas moved to dismiss the indictment, arguing that it breached the non-prosecution clause in his 2018 plea agreement. The district court denied the motion and Thomas entered a conditional plea to six of the counts in exchange for the Government's dismissal of the rest. Doc. 88-2. On appeal, however, the Eighth Circuit Court of Appeals agreed with Thomas' reading of the plea agreement and vacated the sentence. *See United States v. Thomas*, 58 F.4th 964 (8th Cir. 2023).

Meanwhile, the Federal Bureau of Investigation (FBI) started investigating Thomas' conduct outside of the Southern District. It relayed in opening a file that "the Human Trafficking Prosecution Unit of the Department of Justice . . . requested a new investigation be initiated into potential criminal activity by Thomas occurring in the Northern District of Iowa" based on the Eighth Circuit's vacating Thomas' sex-crime convictions in the Southern District. Doc. 95-7. The new investigation built off the prior investigation in many respects. For example, the FBI reviewed the case file and

investigation complied by the United States Attorney's Office (USAO) for the Southern District, including grand jury testimony from victims and DMPD investigators as well as phone records gathered from the prior investigation. The FBI also conversed with authorities in the USAO for the Southern District and used that office's victim coordinator, with the scope of the investigation encompassing victims from the 2020 indictment. Doc. 97 at 11, 14–16.

The FBI performed original work as well, such as interviewing witnesses, subpoenaing documents for links to the Northern District of Iowa and authoring approximately 50 new reports. *Id.* at 2, 14, 17. In 2025, the USAO for the Northern District of Iowa secured an eight-count indictment, charging Thomas with sex trafficking and prostituting the same victims who were involved in the now-defunct 2020 Southern District indictment. *See* Doc. 2 (citing 18 U.S.C. §§ 1591(a)(1), (b)(1), 2422(a)). When the indictment was unsealed, the USAO for the Northern District issued a press release attributing the investigation to both the FBI and DMPD. Doc. 88-2 at 1.

Thomas moves to dismiss the indictment or, alternatively, for discovery pertinent to the initiation of the Northern District's case. Doc. 42. He argues that this case was delegated to the Northern District to circumvent the Southern District's obligation not to prosecute him and that it is a vindictive prosecution in the wake of Thomas' successful appeal. Doc. 42-1.[2] The motion was referred to Judge Roberts, who conducted three hearings on the matter. *See* Docs. 87, 96, 105. In the first hearing, the Government called FBI Special Agent Erik Thysse to testify about the Northern District investigation. Thysse had formally been brought on to investigate Thomas in May 2024 and is one of the two case agents leading the investigation. He testified to his investigation, including

[2] Thomas filed a civil suit in 2024 against those involved in the 2020 prosecution for breaching the non-prosecution clause. *See Thomas v. United States*, No. 24-cv-39 (S.D. Iowa Feb. 1, 2024); Doc. 80-3. Thomas does not appear to base his vindictive prosecution arguments on this since-dismissed lawsuit. I find no connection between Thomas' civil lawsuit and his criminal indictment and will not discuss the civil lawsuit further.

how the previous Southern District investigation had influenced the Northern District one. The other two hearings were to introduce additional exhibits into evidence for purposes of the motion to dismiss.

## *III. STANDARD OF REVIEW*

A district judge reviews a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude

> further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## *IV. DISCUSSION*

### *A. 2018 Plea Agreement*

The 2018 plea agreement is a contract between Thomas and the Government. *United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003) (en banc). Contract principles thus inform its scope, *Thomas*, 58 F.4th at 971, and breaches can be remedied through either specific performance or the withdrawal of the plea. *United States v. Olesen*, 920 F.2d 538, 540 (8th Cir. 1990). It is more than "simply a contract between two parties," however, because Thomas has a due process right in seeing it enforced while concerns for the justice system's integrity linger in the backdrop. *United States v. Norris*, 486 F.3d 1045, 1048 (8th Cir. 2007) (en banc). Thus, the Government must do more than "technically adhere[] to its promise[s]"—it must also respect "the spirit of the promise." *United States v. Mitchell*, 136 F.3d 1192, 1194 (8th Cir. 1998); *accord United States v. Vennes*, 103 F. Supp. 3d 979, 992 (D. Minn. 2015) ("[The Government] cannot take steps amounting to an end run around the [plea] agreement."). As the party asserting a breach, Thomas has the burden of proving it. *United States v. Leach*, 562 F.3d 930, 935 (8th Cir. 2009).

The 2018 plea agreement's terms are not disputed. It expressly binds only the Southern District Attorney's Office, Doc. 88-1 at 1, 6, which is a permissible provision of a plea agreement. *See United States v. Van Thournout*, 100 F.3d 590, 594 (8th Cir. 1996). As the Northern District is a separate office from the Southern District, the current indictment in this district does not directly violate the 2018 plea agreement.

Instead, Thomas challenges whether the Northern District's case upholds the 2018 plea agreement's spirit. Thomas cites Second Circuit case law suggesting that an office will breach its side of a plea agreement by transferring the prosecution to another office

as an end run around restrictions on the former's ability to prosecute the case. He primarily relies on *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) (per curiam).

In that case, Ahmad Mohammad Ajaj attended a terrorist training camp in the Middle East in 1992, where he learned how to construct homemade explosives. *Id.* at 107. He also met Ramzi Yousef and the two of them plotted to employ their newly acquired skills to bomb targets in the United States. *Id.* In September 1992, they entered the United States using fake names and passports. When inspectors noticed Ajaj's altered passport, they searched his belongings and discovered the "terrorist kit" he was carrying. *Id.* He was arrested and later pleaded guilty in the United States District Court for the Eastern District of New York for passport fraud. *Id.* The plea agreement contained a single-office clause limiting the scope of the agreement to the Eastern District of New York. *Id.* at 119. It similarly contained a non-prosecution clause preventing the office from bringing any more charges arising from Ajaj's entry into the United States, including what he "was carrying with him." *Id.*

Ajaj continued plotting with Yousef while imprisoned. *Id.* at 108. In February 1993, Yousef and his recruited co-conspirators detonated explosives in the World Trade Center Complex parking lot. *Id.* Officials later linked Ajaj to the bombing and the Southern District of New York indicted him for his participation in the plot. *Id.*

Ajaj thereafter moved to dismiss the indictment contending that the Eastern District of New York "improperly passed along work to the . . . Southern District of New York . . . to circumvent a restriction on its own ability to prosecute Ajaj on charges stemming from Ajaj's role in the World Trade Center bombing." *Id.* at 118. The Second Circuit disagreed, writing:

> Here, Ajaj presents no evidence that the parties to the Eastern District plea agreement contemplated that it would bar the prosecution of Ajaj in any district other than the Eastern District. Indeed, the explicit terms of the Eastern District plea agreement expressly limited the plea agreement to the Eastern District of New York. Moreover, assuming that the plea agreement would bar the Eastern District prosecutor's office from prosecuting Ajaj for crimes arising from the World Trade Center bombing, Ajaj presents no

> evidence that the Eastern District prosecutor's office attempted to circumvent a restriction on its authority to prosecute by transferring its work to the Southern District prosecutor's office. The Southern District prosecutor's office independently investigated criminal offenses arising from the World Trade Center bombing and filed an indictment in the Southern District charging Ajaj with crimes that were distinct from the passport fraud charges in the Eastern District.

*Id.* at 120. Thus, Ajaj's plea agreement did not bar the prosecution because it expressly bound only the Eastern District of New York. In addition, because bombing the World Trade Center was distinct from Ajaj's passport fraud, the court questioned whether the plea agreement even applied to the second prosecution. Regardless, even assuming the Eastern District of New York's plea agreement would bar that office from prosecuting the bombing, no evidence suggested that the Southern District of New York brought the case to stifle the Eastern District's plea agreement.

Thomas latches onto the last point in *Salameh*'s reasoning. He argues DMPD's and the FBI's investigations were not independent. Because the USAO for the Northern District bases its case on the FBI's work, which in turn relied on DMPD's investigation, Thomas argues that the Northern District is stepping in the Southern District's shoes to prosecute this case. He notes that the FBI began investigating him, and his conduct outside the Southern District, after the Eighth Circuit vacated his 2020 conviction. Much of that subsequent investigation built from DMPD's prior efforts. Indeed, the Northern District credited DMPD, alongside the FBI, for investigating the case. DMPD had already uncovered Thomas' activities outside the Southern District before the FBI became involved. *See, e.g.*, Doc. 95-1 at 2 (victim interview in 2020 describing being taken to Illinois, Minnesota and North Dakota); Doc. 95-3 at 3 (victim describing being taken to Minnesota, South Dakota and Illinois); Doc. 95-6 at 7 (victim describing working in Cedar Rapids, Iowa). During the FBI's investigation, team members spoke with Southern District authorities and the Polk County Victim Advocate sat in on many victim interviews. Doc. 97 at 18; *see also* Docs. 95-9, 95-10. Even from these facts, and using

the Second Circuit's decisions as guidance, I cannot find a breach of the 2018 plea agreement.

Had the FBI started afresh and expended its resources unnecessarily to discover the evidence DMPD already knew about, it seems that Thomas would accept that the Southern District's plea agreement was not implicated. But because the FBI agreed to build from DMPD's background, he asserts that the Southern District's obligations must be somehow imputed to any subsequent work by the FBI. In effect, Thomas argues that the FBI was required to disregard all past work by DMPD. I disagree. For starters, one office's sharing of evidence does not automatically assign that office's obligations to the receiving office. *See, e.g., United States v. Gonzalez*, 93 F. App'x 268, 271 (2d Cir. 2004) (plea agreement binding one office not applicable to another office's prosecution because the other prosecution was connected "at least in part . . . with an independent investigation"). In addition, the record reflects that the FBI's probe went well beyond the prior investigation. The FBI separately subpoenaed documents, interviewed witnesses and continued beyond DMPD's investigation with a focus on Thomas' activities in the Northern District. Of course, Thomas' current charges are related to the Southern District's vacated convictions, and the FBI got its start from the DMPD's work, but neither factor imputes the Southern District's obligations onto the Northern District.

Moreover, Thomas' challenge frustrates, rather than effectuates, the 2018 plea agreement. A one-office limitation clause is intended in part to allow other offices to pursue charges for crimes that occurred in those other districts but relating to conduct at-issue in the plea agreement. Consequently, another office may use evidence gathered for the Southern District's case. *Cf. United States v. Persico*, 620 F. Supp. 836, 846 (S.D.N.Y 1985) (one-office limitation clause allows one office to commit to not using evidence that another office may still use). The one-office limitation is exactly what Thomas agreed to when he signed the 2018 plea agreement with the Southern District of Iowa. He now seeks to unilaterally expand the scope of his agreement to immunize him

from criminal liability for his alleged conduct in other districts. Such an expansion would give Thomas a much greater and unwarranted benefit than what he bargained for.

No outside facts suggest that the Government is the party seeking to skirt the clause. For example, there is no evidence that the USAO for the Southern District is controlling this prosecution such that alter ego principles from contract law might apply. Nor is there evidence that the USAO for the Northern District was consulted about or involved in the Southern District's plea negotiations. *See United States v. Alessi*, 544 F.2d 1139, 1154 (2d Cir. 1976). In short, I can find no reason to rewrite the 2018 plea agreement to bar the prosecution of Thomas in this district. This prosecution does not amount to a breach of the letter or the spirit of the 2018 plea agreement.

### *B. Vindictive Prosecution*

The Due Process Clause prohibits punishing a defendant for exercising his or her constitutional rights. *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). A defendant has a "heavy" burden to establish vindictiveness behind a prosecutor's decision. *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004). There are two ways for a defendant to do so. "First, a defendant may prove through objective evidence that the prosecutor's decision was intended to punish him or her for the exercise of a legal right." *United States v. Graham*, 323 F.3d 603, 607 (8th Cir. 2003). "Absent such evidence, 'a defendant may, in *rare* instances, rely upon a presumption of vindictiveness.'" *United States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015) (quoting *United States v. Kriens*, 270 F.3d 597, 602 (8th Cir. 2001)). A presumption of vindictiveness arises when a prosecutor's actions "establish a reasonable likelihood of vindictiveness" when viewed in context of the entire proceedings. *United States v. Williams*, 793 F.3d 957, 963 (8th Cir. 2015). The defendant's showing must overcome the presumption of regularity afforded to prosecutorial decision-making, *Chappell*, 779 F.3d at 880, and even then, that presumption can be rebutted. *Graham*, 323 F.3d at 608.

Thomas argues that the Northern District vindictively brought this case because he successfully appealed his 2020 convictions, resulting in their vacatur. Judge Roberts found that Thomas failed to supply "objective evidence that prosecutors in the Northern District of Iowa pursued the indictment against him to punish him for exercising his appellate rights." Doc. 106 at 15. Thomas does not object to this finding and, based on my review, I agree. This mean Thomas must establish a presumption of vindictiveness. He cannot.

A presumption of vindictiveness may arise when, after a defendant appeals a conviction, prosecutors seek more serious charges, seemingly to dissuade the appeal. *See Blackledge v. Perry*, 417 U.S. 21, 28 (1974). However, there is no "potential for vindictiveness" when a defendant faces a post-appeal situation no worse than before his appeal. *See United States v. Peoples*, 360 F.3d 892, 896 (8th Cir. 2004). Additionally, no presumption of vindictiveness arises "when the government chooses to indict a defendant on individual acts that arose out of the same nucleus of facts which resulted in an earlier acquittal." *United States v. Robinson*, 809 F.3d 991, 1001 (8th Cir. 2016). Thomas appears to accept both points, but argues that "[t]his is not the run-of-the-mill case" where such propositions are applicable when separate offices are involved. Doc. 42-1 at 11. That nuance is not relevant. Thomas faces no worse a position under indictment in the Northern District as he did in the Southern District. Indeed, this indictment contains nine fewer counts (even if the potential sentence is the same).

As for the timing of the Northern District's indictment, Thomas argues the circumstances are suspect because the Government was aware of Thomas' sex-crimes "since at least 2018," but the Northern District indicted him only after he had successfully appealed his conviction. Doc. 42-1 at 13. Even imputing knowledge from DMPD's investigation to the federal government more broadly, and the Northern District more specifically, the earliest indications that Thomas' activities touched the Northern District arose from interviews conducted in 2020. *See* Docs. 95-1, 95-3, 95-6. By that time, the Southern District had already indicted Thomas for his alleged sex crimes, a factor any

office would consider when deciding whether to invest resources in a prosecution. Moreover, prosecutors may decide to indict for crimes in their district after charges in another office are dismissed. *See, e.g.*, *United States v. Broussard*, No. 19-cr-101, 2024 WL 3362966, at *8 (D. Minn. July 9, 2024). Finally, new evidence was available to the USAO for the Northern District that could have influenced its decision to charge. For example, Thomas twice violated supervised release conditions under his 2018 conviction by associating with prostitutes in 2023. Docs. 80-1, 80-2.

In all, the context and circumstances behind Thomas' vindictive prosecution claim do not overcome the presumption of regularity that would lead to a presumption of vindictiveness. For the same reason, his alternative request for discovery must be denied.[3]

## *V. CONCLUSION*

For the reasons set forth herein:

1. Defendant Marlin Santana Thomas' objections (Doc. 109) are **overruled** and I hereby **accept** the Report and Recommendation (Doc. 106) without modification.

2. Thomas' motion (Doc. 42) to dismiss the indictment is **denied**.

---

[3] The same standard for obtaining discovery appears to apply to both vindictive and selective prosecution claims. *See, e.g.*, *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004) (stating that a defendant "had to produce at least some credible showing" of a selective prosecution claim to obtain discovery before affirming the district court's denial of discovery as to both selective and vindictive prosecution); *United States v. Bucci*, 582 F.3d 108, 113 (1st Cir. 2009); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000); *United States v. Wilson*, 262 F.3d 305, 315–16 (4th Cir. 2001); *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990); *United States v. Martinez*, 105 F. App'x 190, 193 (9th Cir. 2004). Thus, Thomas has a "rigorous standard" to overcome. *United States v. Armstrong*, 517 U.S. 456, 468 (1996). He must point to specific facts sufficient to make a preliminary or threshold showing of the essential elements of a vindictive prosecution claim. *United States v. Aanerud*, 893 F.3d 956, 961 (8th Cir. 1990); *United States v. Kelley*, 152 F.3d 881, 885 (8th Cir. 1998) (citing *United States v. Valona*, 834 F.2d 1334, 1340 (7th Cir. 1987)). Thomas has not met that standard.

**IT IS SO ORDERED** this 18th day of August, 2026.

Leonard T. Strand
United States District Judge